**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF KENTUCKY**
**NORTHERN DIVISION**
**AT ASHLAND**

**CRIMINAL ACTION NO. 14-20-DLB-EBA-2**

**UNITED STATES OF AMERICA**                                             **PLAINTIFF**


**MEMORANDUM OPINION AND ORDER**


**CHRISTINA CARMAN**                                                     **DEFENDANT**

**\*\*\*\*   \*\*\*\*   \*\*\*\*   \*\*\*\***

Defendant Christina Carman has filed two motions – one for acquittal on her two counts of conviction (Doc. # 379) and another for a new trial (Doc. # 380).   The Government has filed its Responses (Docs. # 392 and 391), and Carman has filed her Replies (Docs. # 404 and 403).   Accordingly, both motions are ripe for review.   For the reasons stated herein, Carman's Motion for Judgment of Acquittal will be **denied** as to Count One but **granted** as to Count Two, and her Motion for a New Trial will be **denied** as to Count One but **conditionally granted** as to Count Two.

**I.      Factual Background**

Defendant Carman was convicted of the first two of the twenty-one counts with which she was charged.   Count One alleged a conspiracy to commit mail and wire fraud in violation of 18 U.S.C. § 1349, and Count Two alleged a conspiracy to commit money laundering in violation of 18 U.S.C. § 1956(h).   The jury acquitted on the other nineteen counts.

1

Carman was part of a conspiracy that took advantage of the differentials in states' cigarette excise-tax rates. Selling low-tax-rate cigarettes into high-tax-rate states allowed Carman and the companies with which she associated to undercut the retail competition in those high-tax states. Decades ago, the federal government enacted legislation to prevent companies from taking advantage of such tax arbitrage. The Jenkins Act, as it is known, requires out-of-state sellers of cigarettes to report basic information about their customers (name, address, quantity and brand of cigarettes) to state taxing authorities. This, in turn, allows the states to seek the unpaid excise taxes from their customers, defeating any attempt at tax diversion.

Carman and others committed wire fraud by failing to file the required Jenkins Act reports for their out-of-state cigarette sales. Because they did not report their customers' information, state taxing authorities were unable to collect the excise taxes they were owed. This defrauded state governments of millions of dollars of revenue, while enriching Carman and her associates. Had the companies reported their customers' information, the customers would have been required to pay their state's excise tax. This would have made the conspirators' cigarettes no cheaper – if not more expensive due to the shipping costs – than their legally compliant competitors.

Committing wire fraud requires proof that the defendant used the wires. In Count One, the government presented evidence that a wire transaction occurred when the customers paid for their cigarettes. By inputting their credit card information, a wire signal was sent to merchant accounts for Carman's businesses. Once the wire signal – and, simultaneously in this case, the customers' money – was received by the merchant account, the wire fraud was complete.

2

Count Two charged Carman with conspiracy to commit concealment money laundering. The government alleged that by concealing the true nature of their businesses[1] from the merchant vendors, the conspirators "concealed" the nature and source of their transactions. After the money was released from the merchant accounts, it was sent to bank accounts for Carman's businesses. From there, the money was either reinvested in the businesses or dispersed to Carman and others as income.

After her conviction on these two counts, Carman filed a Motion for Judgment of Acquittal and a Motion for a New Trial. The Court will address each motion in turn.

## II.     Analysis

### A.     *Motion for Judgment of Acquittal*

#### 1.     Standard of Review

In order to prevail on a motion for judgment of acquittal, the convicted defendant must demonstrate that the evidence was insufficient to prove the offense charged. The jury's verdict must stand if, viewing the evidence in the light most favorable to the government, "any rational trier of fact" could have convicted the defendant. *United States v. Stewart*, 729 F.3d 517, 526 (6th Cir. 2013) (citing *United States v. Wettstain*, 618 F.3d 577, 583 (6th Cir. 2010)). The Court may not "weigh the evidence presented, consider the credibility of witnesses, or substitute [its] judgment for that of the jury," and must resolve all conflicts in evidence in favor of the government and draw all reasonable inferences in its favor as well. *United States v. Siemaszko*, 612 F.3d 450, 462 (6th Cir. 2010) (citing *United States v. M/G Transp. Servs., Inc.*, 173 F.3d 584, 588-89 (6th Cir. 1999)).

---

1) Carman's businesses claimed to sell items such as home decor and glass replacement rather than cigarettes.

3

Accordingly, a defendant challenging the sufficiency of the evidence "bears a very heavy burden." *United States v. Clay*, 667 F.3d 689, 693 (6th Cir. 2012).

### 2.  The evidence supports the jury's guilty verdict for Count One.

For Count One, the jury convicted Carman of conspiring to commit wire fraud in violation of 18 U.S.C. § 1349.  The elements of wire fraud are: (1) a scheme or artifice to defraud; (2) a material misrepresentation or omission in furtherance of the scheme; (3) use of interstate wire communications in furtherance of the scheme; and (4) intent to deprive a victim of money or property.  *United States v. Prince*, 214 F.3d 740, 747-48 (6th Cir. 2000) (citing *United States v. Merklinger*, 16 F.3d 670, 678 (6th Cir. 1994)); *see also United States v. Neder*, 527 U.S. 1, 25 (1999) (holding that a scheme to defraud requires the government to prove the presence of a misrepresentation or omission that is material).[2] In order to prove a conspiracy to commit wire fraud, the government must prove that the defendant conspired or agreed with another person to commit wire fraud and that the defendant knowingly and voluntarily joined the conspiracy.  *United States v. Rogers*, 769 F.3d 372, 377 (6th Cir. 2014).

Carman presents two challenges for her conviction on Count One.  First, she claims that, because she personally did not have a duty to speak, there is no omission to support a scheme to defraud.  Second, she claims that there was insufficient evidence to support a finding that she knowingly and voluntarily joined the wire fraud conspiracy.

---

2)  The Sixth Circuit breaks wire fraud into three elements, with the material misrepresentation or omission element subsumed within the scheme or artifice to defraud.  For simplicity's sake, the Court has delineated this requirement separately.

4

Courts, including this one, have held that failing to comply with a regulatory duty to speak can constitute an omission for the purposes of a wire fraud charge.  (*See* Doc. # 182).  The Jenkins Act imposed a regulatory duty – enforced with criminal penalties – on companies that sold cigarettes through the mail.[3]  Carman argues that this regulatory duty fell on the corporate entities that sold the cigarettes and not on the defendants as individuals.  (See Doc. # 379-1 at 8).  Under Carman's view, because the Defendants had no individual duty to speak, they cannot have committed an omission.

The Jenkins Act requires "[a]ny person who sells or transfers for profit cigarettes in interstate commerce" to file reports with the state tax administrator detailing the brand and quantity of the cigarettes sold as well as the name and address of the person to whom the cigarettes were sold.  15 U.S.C. § 376.  The term "person," as defined by 15 U.S.C. § 375 "includes corporations, companies, associations, firms, partnerships, societies, and joint stock corporations, as well as individuals."[4]  Thus, the plain language of the statute includes individuals as those who can be responsible for filing reports.  Despite this language, Carman claims only the Defendants' companies could have been responsible for filing the required reports.

---

3) The conspiracies to commit wire fraud and concealment money laundering charged in Counts One and Two were completed before the Prevent All Cigarettes Trafficking (PACT) Act was enacted.  Thus, only the Jenkins Act is relevant to the discussion of these counts.

4) The PACT Act, which is inapplicable to Count One due to the time period of the conduct charged, altered the definition of "person" under § 375.  The new definition states that "'person' means an individual, corporation, company, association, firm, partnership, society, State government, local government, Indian tribal government, governmental organization of such a government, or a joint stock company."  This new definition added new persons, and removed the "as well as" language from before "person," further clarifying that § 375 is designed to apply to natural persons.

5

In support of this proposition, Carman cites *City of New York v. Nexicon, Inc.* No. 03-CV-383-DAB, 2006 WL 647716, at *8 (S.D.N.Y. Mar. 15, 2006), *aff'd in part, rev'd in part and question certified sub nom. City of New York v. Smokes-Spirits.com, Inc.*, 541 F.3d 425 (2d Cir. 2008), *certified question accepted*, 897 N.E.2d 1061 (N.Y. 2008), *and certified question answered*, 911 N.E.2d 834 (2009), *and rev'd and remanded sub nom. Hemi Grp., LLC v. City of New York*, 559 U.S. 1 (2010).   In *Nexicon*, a district court in New York "employing basic statutory construction analysis" found that it was "clear that companies [were] the primary entities responsible for filing Jenkins Act reports." *Id.* "The catchall phrase 'as well as individuals' suggests a separate class of people who may be liable under the Jenkins Act, but does not by any means connote officers or directors of the business entities listed before the phrase." *Id.*

It is unclear what canon of statutory construction that court was using, but this Court prefers to begin with plain meaning.  The simplest reading of the statute defines person to include individuals.  Fortunately, a proper reading of the definition is of no consequence here because, even if Carman is correct in her reading of the statute, she still cannot escape liability for conspiracy to commit wire fraud.

Carman was not charged with a violating the Jenkins Act; she was charged with conspiring to create a scheme or artifice to defraud.  In furtherance of that scheme, Defendants created companies to ship cigarettes to out-of-state customers without filing the required Jenkins Act reports.  It may be assumed that the companies owed this regulatory duty and failed to comply.  But those companies were created by Carman and others in order to effectuate the ultimate scheme to defraud.  While it may be true that she and the other Defendants had no duty to speak, they created companies that did.  Those

companies failed to comply with the Jenkins Act requirements, thereby enabling their overall scheme to defraud to function. The scheme to defraud element, which includes the material misrepresentation or omission requirement, is " not defined according to a technical standard," and instead is a "'reflection of moral uprightness, of fundamental honesty, fair play and right dealing in the general and business life of members of society.'" *United States v. Daniel*, 329 F.3d 480, 486 (6th Cir. 2003) (quoting *United States v. Van Dyke*, 605 F.2d 220, 225 (6th Cir. 1979)); *see also United States v. Bruce*, 488 F.2d 1224, 1229 (5th Cir. 1973) (holding the same). Moreover, the Sixth Circuit has held that the material misrepresentations underpinning a scheme to defraud need not be defendant-specific; the "evidence need only show that each defendant participated in a scheme to defraud that involved a misrepresentation." *United States v. Birnie*, 193 F. App'x 528, 536 (6th Cir. 2006) (per curiam). Thus, Carman still can be guilty of conspiring to violate the mail and wire fraud statutes even if the companies were the entities that owed the duty to speak in this case. To hold otherwise would be to permit Carman to escape criminal liability simply because she chose to operate her fraudulent scheme by availing herself to the corporate form. In such a legal landscape, individuals would be permitted to lie with impunity so long as the speaker was a business entity; this cannot be the purpose of incorporation.

Next, Carman alleges that there was no evidence presented that establishes that she agreed to "commit the crime of wire fraud and knowingly and voluntarily joined the conspiracy." (Doc. # 379-1 at 8). This is not so. In order to prove that Carman joined the wire fraud conspiracy, the government does not have to prove the existence of a contract or other explicit agreement; instead, it can prove by circumstantial evidence and inference

7

that Carman agreed to join the conspiracy and was a voluntary and willful participant in it. The government presented evidence that the businesses and accounts associated with the conspiracy were held in Carman's name.  She was also actively engaged in the day-to-day operation of the company.  She packed cigarette shipments, attended meetings with suppliers, and was known as second-in-charge of the companies.  She told employees to warn customers that the charges from the companies would be appear to be for products other than cigarettes, demonstrating that she knew about the deceit involved in the fraud. The government presented more than sufficient circumstantial evidence from which a jury could infer that Carman was a willful and voluntary participant in the scheme to defraud.

> **3.      The government failed to prove beyond a reasonable doubt that Carman engaged in a conspiracy to commit concealment money laundering.**

While the jury's decision to convict on Count One will remain undisturbed by either of Carman's Motions, her Motion for Judgment of Acquittal for Count Two must be granted. The government failed to demonstrate the Defendants entered into a financial transaction that was designed to conceal the proceeds.

Count Two of the Indictment charged Carman and others with conspiracy to commit concealment money laundering, in violation of 18 U.S.C. §§ 1956(a)(1)(B)(i) & (h). Section 1956(a)(1)(B)(i) reads as follows:

> Whoever, knowing that the property involved in a transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity . . . knowing that the transaction is designed in whole or in part . . . to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity.

Section 1956(h) specifically criminalizes joining a conspiracy to violate §§ 1956 & 1957, and does not require proof of an overt act. *United States v. Hynes*, 467 F.3d 951, 964 (6th

8

Cir. 2006) (citing *Whitfield v. United States*, 543 U.S. 209, 211 (2005)).

The government's case against Carman on Count Two was based primarily on fraudulent applications presented to the merchant vendors that Defendants' companies used to complete credit card transactions. Defendants' online mail-order cigarette business enabled customers to place cigarette orders over the telephone. Customers would provide a customer-service representative at Defendants' companies with their mailing address and credit card information. Because the transactions were not in person, the customer-service representative would have to manually enter, or "key in," the credit card information. Once the credit card information was entered, the customer's credit card would be charged. But the money from this transaction did not go directly to Defendants' companies' bank accounts. Instead, the money from the credit card was sent to a merchant vendor that processed the credit-card transaction. The money was held by the merchant vendor and then transmitted to the companies' bank accounts once a month.

There was one problem with this business model. Credit card companies and merchant vendors prohibit their services from being used for non-in-person credit card transactions for cigarettes. This, of course, is precisely what Defendants were doing. Not using credit cards, however, would decrease the number of customers that Defendants could reach. So Defendants lied to the merchant vendors about the true nature of their businesses. They claimed they were performing glass-replacement services and selling home decorations, and also enlisted the help of an employee at one of the merchant vendors to make sure that their accounts remained open, despite suspicious activity.

The government presented this evidence to the jury and argued that the concealment of the true nature of Defendants' businesses, coupled with the credit card

9

transactions, was concealment money laundering.  Carman argues that she cannot be guilty of conspiracy to commit concealment money laundering because money sent from the customers to Defendants' businesses did not become "proceeds" until after it was deposited into the Defendants' companies' bank accounts.  After the money reached the bank accounts, she claims that there was no transaction designed to conceal.

Determining whether the government proved beyond a reasonable doubt that Carman is guilty of Count Two involves untangling several issues.  First, the Court must determine when the underlying wire fraud ended.  Second, it must decide when the receipts from the wire fraud became proceeds.[5]  Third, it must find a transaction involving those proceeds that was designed, in whole or in part, to conceal.

### a.    Completion of the Wire Fraud and the Determination of Proceeds.

Because money laundering is a separate offense from the underlying predicate offense – here, wire fraud – the primary issue in a money laundering charge involves determining when the predicate offense becomes a completed offense after which money laundering can occur.  *United States v. Kerley*, 784 F.3d 327, 344 (6th Cir. 2015) (quoting *United States v. Nolan*, 223 F.3d 1311, 1315 (11th Cir. 2000)); *see also United States v. Rayborn*, 491 F.3d 513, 517 (6th Cir. 2007) (holding that the plain language and legislative history of § 1957 suggest that Congress targeted only those transactions occurring after proceeds have been obtained from the underlying unlawful activity).  The funds may come from a completed predicate offense or a completed phase of an ongoing offense.  *Id.*  The

---

5)  In order to sustain a conviction for concealment money laundering, the government needs to prove that the proceeds involved in the transaction were receipts from a specified unlawful activity; it does not have to prove that those receipts were profits.  *Buffin v. United States*, 513 F. App'x 441, 446-47 (6th Cir. 2013).

government's theory of the case, as alleged in the indictment, should be utilized in determining whether the government has proven the requisite distinct predicate offense. *Id.* (citing *United States v. Cosgrove*, 637 F.3d 646, 655 (6th Cir. 2011)).

The Indictment, in addition to the government's presentation of evidence at trial, suggests that the wire fraud was completed when the customers' credit cards payments were sent to the merchant vendors. (See Doc. # 1-2 at 12). Paragraph eleven of Count One specifically references the use of a Worldpay merchant-vendor terminal to charge customers' credit cards. The Indictment, and the government's evidence at trial, suggested that this was the "use-of-wires" element that supported its charge of a wire fraud conspiracy.[6] Thus, at the moment the customers' credit cards were charged, the wire fraud was completed.

The wire fraud may have been completed when the customers' credit cards were charged, but that does not answer when Defendants gained control of the proceeds so that they could engage in the subsequent concealment transaction. Carman claims that there were no proceeds until the merchant vendors transferred the customers' payments into Defendants' business accounts

"Control" is the operative word in this analysis. Until Defendants had sufficient control over the money, it could not have been proceeds. *Prince*, 214 F.3d at 749-750. Accordingly, the question is what level of control is sufficient, and two Sixth Circuit cases inform the Court's analysis.

---

6) Although Count One charges Carman with conspiracy to commit mail or wire fraud, the government's proof at trial was primarily predicated on wire fraud.

First, in *United States v. Prince*, the defendants engaged in a scheme to defraud investors by claiming that their businesses could purchase assets at bankruptcy and then resell the them at a sizable profit. *Id.* at 745. Defendants acquired their victims' money in one of three ways. *Id.* Under arrangement one, defendants directed investors to wire transfer money into the bank accounts of third parties. *Id.* at 746. The third party would then write a check for cash, cash that check, and then transfer the money to one of the defendants. *Id.* The second arrangement had the investors wiring money to third parties via Western Union. *Id.* Once the third parties received the money, they would transfer it in cash to one defendant, who then transferred it to another defendant. *Id.* Under the final arrangement, investors wired the money directly to one defendant who then transferred it to another defendant. *Id.*

The court in *Prince* concluded that the money was proceeds once it was wired by the victim-investors. *Id.* at 748. The court held that actual, physical possession over the proceeds was unnecessary, and instead, all that was required was for the money to be under "sufficient control" of the defendants. *Id.* at 749-50. Because of the pre-existing arrangements with third parties, transfers to those parties constituted possession-by-proxy that was sufficient for the receipts of the fraud to be proceeds. In coming to this determination, the court relied on cases from other circuits that found sufficient control where: (1) money was wired into third-party bank accounts for which defendant had a pre-existing arrangement for receiving the funds; (2) where money was wired to a company that took kickbacks in exchange for transferring the money to defendant; and (3) where money was transferred to an escrow account for which the escrow agent had no discretion for how to distribute the funds. *See  United States v. Savage*, 67 F.3d 1435, 1443 (9th Cir. 1995);

12

*United States v. Smith*, 44 F.3d 1259, 1263 (4th Cir. 1995); *United States v. Leahy*, 82 F.3d 624, 635-36 (5th Cir. 1996).

The Sixth Circuit's decision in *United States v. Rayborn* further clarified how much control is necessary before money can be considered proceeds. In *Rayborn*, the defendant effectuated his fraud by lying to Wells Fargo on his loan application for a new home. *Id.* at 515-16. Defendant overstated his income so that he and his wife could obtain financing for a home they otherwise could not afford. *Id.* The government charged defendant with mail fraud and money laundering.[7] The government's theory of money laundering claimed that the mail fraud was completed when defendant mailed the fraudulent loan documents. The funds for the loan were then transferred to the closing agent who was selling defendant a house. Thereafter, the money laundering occurred when the defendant used the proceeds from the fraud – the loan from Wells Fargo – to buy a home.

Defendant claimed that he never had sufficient control over the proceeds. The court in *Rayborn*, however, found that the money derived from the fraud constituted proceeds when the loan was approved, and the funds were transferred to the closing agent. *Id.* at 517. The court found that "the fact that the proceeds were never in Rayborn's physical possession, or even a personal bank account, [was] of no moment." *Id.*

Applying the above-mentioned cases to the case at bar, the Court finds that the money derived from the wire fraud constituted proceeds when it arrived in the merchant vendors' accounts. As previously mentioned, the wire fraud was completed, at the latest, when the customers wired funds via their credit cards to the merchant vendors who

---

7) The defendant in *Rayborn* was charged with money laundering pursuant to 18 U.S.C. § 1957, but the Court finds the proceeds analysis equally applicable to violations of 18 U.S.C. § 1956.

processed Defendants' payments.  When these funds were then deposited into the merchant vendor accounts, they were proceeds despite the fact that Defendants did not have actual physical possession of them.  The money in the merchant vendor accounts would be transferred to Defendants' companies' bank accounts at regular monthly intervals. The merchant vendors did not have discretion in disbursing the funds, and acted simply as a middle man between the Defendants and their customers.[8]  *See Leahy*, 82 F.3d at 635-36 (cited with approval in *Prince*, 214 F.3d at 749).

### b.      A transaction designed to conceal.

The ultimate flaw with the government's argument for conviction on Count Two is the lack of evidence of a transaction designed to conceal.  As will be seen, the inquiry is not as simple as finding a transaction that involved concealment.

The Supreme Court has clarified the meaning of "designed in whole or in part to conceal."  In *United States v. Cuellar*, the Court addressed 18 U.S.C. § 1956(a)(2)(B)(i), which criminalizes the concealment transportation of money rather than concealment monetary transactions.  553 U.S. 550 (2008).  In *Cuellar*, the defendant was arrested while driving through Texas on his way to Mexico.  *Id.* at 553-554.  When his car was pulled over, $81,000 was found bundled in a secret compartment in the car.  *Id.*  Defendant was charged with "attempting to transport the proceeds of unlawful activity across the border, knowing that the transportation was designed to 'conceal or disguise the nature, the location, the source, the ownership, or the control of the money.'"  *Id.* (citing §

---

8) The Court finds that the customers' ability to initiate a "charge back" does not alter the analysis.  While some charges might have been revoked, resulting in the receipts never reaching the Defendants, the merchant vendors did not control this process.  Additionally, the evidence presented at trial suggested that most of the charges were successfully processed.

1956(a)(2)(B)(i)).

The Supreme Court ultimately reversed the defendant's conviction, finding that he had not engaged in a concealment transportation. The Court held that merely hiding funds during transportation was not sufficient to violate the money laundering statute, and that the term "design," in the context of the money laundering statute, means "purpose or plan." *Id.* at 563-64. In overturning the Fifth Circuit's decision, the *Cuellar* court noted that the lower court used "design" in two different ways, only one of which was consistent with the statutory meaning. *Id.* When the Fifth Circuit referred to the "transportation design or plan to get the funds" out of the country, it employed the proper sense of the word, but it erred when it used the term to refer to aspects of the transportation that were designed to conceal. *Id.* at 564. This latter definition of design would permit the money laundering statute to apply "whenever a person transported illicit funds in a secretive manner," and the Supreme Court found such a reading "implausible." *Id.* at 564-65.

The Supreme Court also highlighted the limited probative force of circumstantial evidence of concealment transportation that can be derived from secretive aspects of that transportation. *Id.* at 566. "There is a difference between concealing something to transport it, and transporting something to conceal it," and, the Court added, "that is, *how* one moves the money is distinct from *why* one moves the money. Evidence of the former, standing alone, is not sufficient to prove the latter." *Id.* at 566 (citing 478 F.3d 282, 296-97 (Smith, J., dissenting) (emphasis in original).

The Sixth Circuit has taken the reasoning of *Cuellar* and applied it to concealment transactions under § 1956(a)(1)(B)(i), the section of the money laundering statute at issue

here.  In *United States v. Faulkenberry*, the Sixth Circuit held that *Cuellar*'s definition of "design" should be applied identically to concealment transactions.  614 F.3d 573, 586 (6th Cir. 2010).  The Court of Appeals found that it was not enough for the government to prove that a transaction had a concealing effect. *Id.*  Moreover, it held that it is not enough "that the transaction was structured to conceal the nature of the illicit funds," and even deliberate concealment "as mere facilitation of some other purpose, is not enough to convict." *Id.*

Concealment does not have to be the only purpose of the transaction, and "purpose and structure" are often related. *Id.* (citing *Cuellar*, 553 U.S. at 565-66).  Accordingly, depending on the context, proof that the transaction was structured to conceal "can yield an inference that concealment was a purpose of the transaction." *Id.*  "But the ultimate question under the [money laundering] statute is one of purpose, not structure." *Id.*

Applying this definition of design to the facts of the case before it, the Sixth Circuit reversed the *Faulkenberry* defendant's conviction for concealment money laundering. *Id.* In that case, the defendant created a phony report and made other false representations in order to convince individuals to invest in his company's bonds.  Further, he lied to certain trustees so that they would release funds that otherwise should not have been released. The government argued that those concealing attributes permitted the jury to infer that the transaction was designed to conceal.  The Sixth Circuit disagreed, holding that these concealing attributes "only tells us the transaction was *structured* to conceal the nature of the funds, which is precisely the meaning of 'designed' the Supreme Court rejected in *Cuellar*." *Id.* (emphasis in original).  Instead, the government was required to demonstrate that "the concealment was one of the *purposes* that drove Faulkenberry to engage in the transaction in the first place." *Id.*  (emphasis in original).

16

*Cuellar* and *Faulkenberry* mandate Carman's acquittal for the concealment money laundering conviction in this case. The government's theory of that charge is implausible, and the evidence it presented was insufficient to sustain a conviction – even when viewed under the government-friendly standard of Rule 29.

The government demonstrated – and the Defendants did not seriously contest – that the applications sent to the merchant vendors contained false information about the nature of the businesses. But there was no concealment from that point forward. *See Rayborn*, 491 F.3d at 517. Carman was listed as the owner of the businesses. She and her husband paid themselves from the business accounts and made no attempts to hide or disguise these transactions. And as the government went through much effort to prove, Carman was not merely a front for the businesses; she was intimately involved in its day-to-day operations. She and her husband bought homes and cars with the proceeds, but the money laundering statute is not a "money spending statute." *See United States v. Warshak*, 631 F.3d 266, 321 (6th Cir. 2010). Moreover, they conducted all of these transactions in their true names and made no effort to conceal these purchases. There were no complex subsequent transactions disbursing the funds. *Faulkenberry*, 614 F.3d at 586; *see also United States v. Embry*, Nos. 14-3870, 14-3871, 2016 WL 1127804, at *4 (6th Cir. March 23, 2016). Moreover, the government, in both the Indictment and at trial, relied almost exclusively upon the false merchant vendor accounts to support the concealment money laundering alleged in Count Two.

The governments argues that the transaction between the merchant vendors and the businesses is sufficient to constitute concealment money laundering. This transaction occurred after the wire fraud was completed and after the money was under sufficient

17

control by Defendants to be considered proceeds.  The transactions did involve aspects of concealment – indeed, the merchant accounts would have never been created nor the funds released had the Defendants been honest about the nature of their businesses.  But the purpose of the transaction between the merchant vendors and the Defendants' accounts was not to conceal the nature, location, source, control, or ownership of the funds; rather,  it was so the Defendants could actually obtain the proceeds.  Legally, the money may have been proceeds when it hit the merchant accounts, but for all practical purposes, it was not the Defendants' money until it was transferred into the business accounts.  Thus, the Defendants had to engage in the merchant-vendor-to-business-account transaction in order to reap the fruits of their fraudulent labor.  It is no different than the defendant in *Cuellar* who hid drug money in a secret compartment in his car.  He concealed the money in order to move it; he did not move the money in order to conceal it.  His purpose was returning money to his boss.  Similarly, there was concealment here so that the merchant vendor transactions could occur, but the purpose of those transactions was not to conceal.

The government's Indictment itself supports this conclusion.  In Count One – the predicate wire fraud for Count Two – paragraphs ten and eleven charge that the wire fraud conspiracy was facilitated by a merchant vendor employee and by fraudulent applications sent to that merchant vendor so that the true nature of the products being sold would be disguised.  This, of course, makes sense.  Defendants' businesses could be much more profitable if their customers could use credit cards to make purchases.  The government's evidence and its theory of the case demonstrate that the merchant vendor accounts and the transactions related thereto were designed to facilitate the underlying fraud.

18

A recent Sixth Circuit opinion is instructive.  In the *United States v. Embry*, the Sixth Court reversed a concealment money laundering conviction conceptually identical to this case.  Nos. 14-3870, 14-3871, 2016 WL 1127804 (6th Cir. Mar. 23, 2016).  *Embry* involved a home mortgage loan fraud.  In that case, Defendants overstated the income of one defendant in order to obtain a large home loan.  The escrow company, which received the loan and investor funds, later released funds to "Wolfco dba Kenneth T. Embry."  Wolfco was actually controlled by the defendants, and that company released the fraudulent proceeds to other members of the conspiracy.  The Court of Appeals sustained the defendants' convictions for wire fraud, but reversed the concealment money laundering convictions.  The court noted that the deception involving Wolfco fell short of proving concealment money laundering because the "purpose of that deception was to conceal from the lender that the money would be paid to those participating in the fraud rather than to fund work on the house."  *Id.* at *4.  It was not a "ploy to disguise the nature, location, source, ownership, or control of the proceeds," as evidenced by defendant Embry's name appearing on the account.  *Id.*  Here, the purpose of the merchant vendor deception was to conceal from the merchant vendors that the money was going to an online cigarette retailer rather than a glass replacement or home decoration company.

The government's theory of the case falls into the trap of *Cuellar* and *Faulkenberry* in that there is a transaction that contains certain aspects of concealment, or that is structured to conceal, but cannot fairly be characterized as being entered into in order to conceal.  Rather, as noted above, the purpose of the merchant vendor transactions was to further the fraud and to make that fraud more profitable.  Simply because there was concealment of the true nature of Defendants' businesses to the merchant vendors coupled

19

with a transaction does not mean that the government has proven concealment money laundering. Instead, the concealment in this case only explains how the defendants were able to use the merchant vendors to enable their customers to use credit cards.

Perhaps the easiest way to think about the flaw in the government's case is to think about concealment money laundering at its conceptual root. When did Defendants try to clean this "dirty money"? As best the Court can tell, they never did. Once the wire fraud was completed, the government failed to present any evidence of a transaction entered into to conceal.

### B. *Motion for a New Trial*

#### 1. **Standard of Review**

Federal Rule of Criminal Procedure 33 allows a defendant to request that any judgment be vacated and that a new trial be granted if the "interest of justice so requires." That motion can be granted if the verdict "was against the manifest weight of the evidence," or if a "substantial legal error" occurred during the proceedings. *United States v. Callahan*, 801 F.3d 606, 616 (6th Cir. 2015) (quoting *United States v. Munoz*, 605 F.3d 359, 373 (6th Cir. 2010)). When considering whether a verdict was against the weight of the evidence, the district court acts "in the role of the thirteenth juror," and may consider the credibility of witnesses and the weight of the evidence. *Callahan*, 801 F.3d at 616 (quoting *United States v. Lutz*, 154 F.3d 581, 589 (6th Cir. 1998)). Any legal error that is significant enough to require reversal on appeal is an adequate ground for granting a new trial. *Munoz*, 605 F.3d at 373 (quoting with approval *United States v. Wall*, 389 F.3d 457, 474 (5th Cir. 2004)). Carman's Motion for a New Trial is predicated on both of the above-mentioned

premises.  First, she alleges substantial legal error by the Court in allowing the government to present evidence of tax loss.  Second, she claims that the verdict was against the manifest weight of the evidence.

### 2.    Evidence of loss was properly permitted to demonstrate intent.

Carman first claims that the Court's decision to allow evidence of loss was a legal error so substantial as to require a new trial.  In order for a legal error to be "substantial" it must be egregious enough that it would warrant reversal on appeal.  *Munoz*, 605 F.3d at 373.  Carman claims that, because loss is not an element of mail or wire fraud, allowing the government to present evidence of tax loss to the jury created prejudice that warrants reversal of the conviction here.

It is unclear whether the tax-loss evidence in this case would require reversal, even if that evidence was admitted in error.[9]   The Court, agreeing with Carman that loss is not an element of mail or wire fraud, admonished the government to limit its presentation of such evidence and it complied.  Loss is not an element of fraudulent schemes under 18 U.S.C.  §§ 1341-43 because successful schemes are as criminal as the unsuccessful ones. *See United States v. Turner*, 465 F.3d 667, 680 (6th Cir. 2006) (holding that "the mail fraud statute does not require an actual loss of property because success of the scheme is not an element of the offense") (citing *Merklinger*, 116 F.3d at 678).

---

9) *United States v. Farrington*, 389 F.2d 357, 360 (6th Cir. 1968) does not require a different result.  In that case, the Court of Appeals set aside a conviction where the court permitted evidence of loss and where the judge made repeated and prejudicial references to the losses, even though the court had instructed that loss was not an element of any offense charged.  *Farrington* involved charges that defendant violated 18 U.S.C. § 1010.  That offense, in contrast with the offenses charged here, does not involve any fraud intended to deprive another of property; instead, it criminalizes making false statements to the government.  *See United States v. Carroll*, 73 F. App'x 222, 225 (9th Cir. 2003) (holding that *Farrington*'s holding regarding losses is misplaced as applied to fraud cases).

But the Court did not arbitrarily permit evidence of tax loss; instead, it permitted the government to show that Carman and others had the requisite intent to defraud. *United States v. DeSantis*, 134 F.3d 760, 768 (6th Cir. 1998); *see also United States v. Sutherlin*, 118 F. App'x 911, 914 (6th Cir. 2004) (holding that, in trial for various frauds, including mail fraud, the government was entitled to introduce proof of investor loss to prove the defendants' specific intent to defraud)); *United States v. Copple*, 24 F.3d 535, 545 (3d Cir. 1994) (proof of loss is relevant in fraud prosecution to prove intent); *United States v. Sokolow*, 91 F.3d 396, 406-07 (3d Cir. 1996). While it is true that the Court must be careful to ensure that the evidence of loss is not designed to "generate feelings of sympathy for the victims" and to create "outrage toward [the defendant] for reasons not relevant" to the charges faced, *Sokolow*, 91 F.3d at 406 (quoting *Copple*, 24 F.2d at 546), the Court took steps here to protect Defendants from being unduly prejudiced by the loss evidence. Specifically, it warned the government that repeated references to loss would not be tolerated, and that evidence of loss would be permitted only for the limited purpose of demonstrating intent.

Defendants' fraudulent scheme, while complicated at first blush, is simplified once evidence of tax loss is admitted. Defendants did not comply with required regulations, allowing their customers to buy cigarettes without paying required state-excise taxes and without fear that the tax man would ever come knocking. This allowed the customers to save money and for Defendants' businesses to sell cigarettes at a greater volume (and at an increased profit), all at the expense of state coffers. Evidence of loss was necessary to highlight the fraudulent diversion of revenue from state governments to Defendants and their customers. Moreover, in compliance with *DeSantis*, Carman and the other

Defendants were permitted to show that tax losses were not caused by their fraudulent scheme. *DeSantis*, 134 F.3d at 768. At trial, Defendants repeatedly asked witnesses who actually owed the taxes due on the cigarettes; without exception, the answer was the customer. Evidently, the jury saw through this technicality and was capable of understanding the indirect, though highly effective, way in which Defendants' scheme to defraud operated. Accordingly, the Court finds that evidence of loss was properly admitted for the limited purpose of proving intent, and that Carman was given ample opportunity to demonstrate that her businesses were not responsible for that loss.

### 3.   Carman's conviction on Count One was not against the manifest weight of the evidence.

In the section above sustaining Carman's conviction on Count One against her Motion for Judgment of Acquittal, the Court highlighted the evidence that was used against her. The motion for a new trial standard does not require the Court to draw inferences and weigh evidence in the government's favor, but even when the thumb is removed from the scales, the conviction is not against the manifest weight of the evidence.

The government demonstrated that Carman was a willful and willing participant in the wire fraud conspiracy. She was involved in the day-to-day operations of the companies, and her former employees testified that she was widely viewed as second-in-command of the operation. In addition, Carman was listed as the owner of the companies and was paid handsomely from the profits. Carman even packed the boxes of cigarettes for shipment and instructed employees to tell customers to expect their credit card bill to reflect a purchase for something other than cigarettes, leaving little doubt that she knew about the clandestine nature of the businesses. Accordingly, Carman is not entitled to new

23

trial on Count One.

### 4. Carman's conviction on Count Two was against the manifest weight of the evidence.

The Court previously determined that Carman's Motion for Acquittal should be granted as to Count Two because, construing all evidence and inferences in the prosecution's favor, the government failed to prove that count beyond a reasonable doubt. Where the defendant raises both a Rule 29 motion for acquittal and a Rule 33 motion for a new trial post-conviction, and where the district court grants the motion for acquittal in whole or in part, that court must still make a conditional ruling on the defendant's motion for a new trial in the event that the conviction is reinstated on appeal. Fed. R. Crim. P. 29(d)(1). Accordingly, even though the Court has determined that Carman should be acquitted of Count Two, it still must determine if she should be granted a new trial on that count.

If the Court's decision to acquit Carman of Count Two is overturned on appeal, Carman still should be granted a new trial on Count Two.[10] As detailed above in discussing the grant of Carman's Motion for Judgment of Acquittal as to Count Two, the government failed to produce sufficient evidence to sustain that conviction, and the jury's decision to convict on that count was against the manifest weight of the evidence. The government failed to produce competent evidence of a transaction that was designed to conceal the nature, source, location, or ownership of the illegal proceeds. Concealing the nature of the businesses from the merchant vendors is deficient in this case because that concealment

---

10) The Court's decision to conditionally grant a new trial for Count Two does not disturb its decision to sustain the conviction for Count One and to deny a new trial for that count as well.

was designed to facilitate the underlying wire fraud rather than to conceal anything about the proceeds.  As stated before, the relevant question is "why" the transaction occurred, not "how."  The merchant vendor transactions cannot fairly be found have been entered into to conceal; instead, they were engaged in to transfer the funds to Defendants' businesses so that they could derive income.

To the extent that the government presented evidence of other transactions that could be considered concealment transactions, it expended almost no time or effort in developing those transactions or theories at trial.  For example, the government mentioned purchases of cars and homes, but did not develop any details about the purchases and completely failed demonstrate that these transactions were entered into with concealment as a purpose.  Thus, as the case was presented at trial, the Court finds that the jury's decision was against the manifest weight of the evidence, and that Carman is entitled to a new trial on that count should the Court's decision to acquit her be overturned.

## III.    Conclusion

Accordingly, **IT IS ORDERED** as follows:

(1)    Defendant Carman's Motion for Judgment of Acquittal (Doc. # 379) is **denied as to Count One, but granted as to Count Two**;

(2)    Defendant is hereby acquitted of Count Two;

(3)    Defendant Carman's Motion for a New Trial (Doc. # 380) is **denied as to Count One, but conditionally granted as to Count Two**; and

(4)    A judgment reflecting the acquittal on Count Two will be filed contemporaneously herewith.

25

This 4th day of May, 2016.



Signed By:

**_David L. Bunning_**

**United States District Judge**

K:\DATA\ORDERS\Ashland Criminal\2014\Maddux orders\14-20 MFA and MNT Order.wpd